### YARDLEY v. PHILLER et al.

(Circuit Court, E. D. Pennsylvania. November 28, 1893.)

#### No. 44.

1. NATIONAL BANKS—INSOLVENCY—PREFERENCES—CLEARING HOUSE BALANCES.

By a special agreement, a national bank, instead of making the usual deposit of securities as collateral for the payment of its daily balances to the clearing house, each day left with the clearing house manager all the checks drawn upon it, received from other banks, to be held until its balance for the day was paid, and then surrendered. The bank was closed for insolvency while a package of checks was so held, and thereupon the clearing house collected the whole amount thereof from the other banks, and, after applying the necessary sum to the liquidation of the bank's balance for that day, used the surplus in paying indebtedness of the bank to other banks, and in canceling certain clearing house certificates. *Held,* that this disposition of the surplus was not warranted by the agreement, and therefore operated to give a preference, contrary to the provisions of the national banking law.

2. SAME.

The clearing house association, having made an unauthorized disposition of the surplus, was directly liable therefor to the receiver of the bank, and he was not required to sue the banks to whom the money was distributed.

3. EQUITY—PARTIES—CLEARING HOUSE ASSOCIATION—HOW SUED.

A clearing house association is properly sued in the names of the committee who have entire control of its business, funds, and securities.

In Equity. Bill by Robert M. Yardley, receiver, against George Philler and others. Decree for plaintiff.

Read and Pettit, for plaintiff.

Angelo T. Freedley and John G. Johnson, for defendants.

DALLAS, Circuit Judge. The bill in this suit was filed by the receiver of the Keystone National Bank against seven persons, who are designated as "being the clearing house committee of the Clearing House Association of the Banks of Philadelphia." It prays that said Clearing House Association be decreed to deliver to the plaintiff certain railway company bonds, and also certain checks, or, as to the latter, to pay to him the amount collected thereon. The claim with respect to the bonds is not insisted upon, and therefore the case, as actually presented, relates only to the checks and the transactions connected with them. The defendants filed a joint answer. The evidence has been taken, and the cause, having been fully argued, is now for decision upon the pleadings and proofs.

Upon the morning of March 20, 1891, at the time appointed by the constitution of the Clearing House Association, a clerk of the Keystone Bank, duly acting on its behalf, took to the clearing house checks which had been deposited with that bank, and for which it had credited the respective depositors. These checks had been drawn on other banks, members of the association, and amounted in the aggregate to the sum of $70,005.46. They were not put up in a single package, nor were they delivered to the Clearing House Association, or to any representatives of that body. They were inclosed in several sealed envelopes, each of which contained only the checks drawn on one particular bank, and to the agent of each bank, there present for the purpose of receiving such packages, the envelope containing the checks drawn on that bank was delivered. At the same time and place, and in the same way, certain banks, members of the association, severally delivered to the Keystone Bank checks drawn upon it, and which had been deposited with said other banks, respectively, to the aggregate amount of $117,035.21. In no case was satisfaction then made for the checks thus delivered either by or to the Keystone Bank. This was to be accomplished through the system of exchanges provided for by the Clearing House Association, which was created for the express purpose of effecting "at one place the daily exchanges between the several associated banks, * * * and the payment, at the same place, of the balances resulting from such exchanges," but at a later hour. The Keystone Bank, upon the day in question, having, as has been stated, delivered checks to the amount of $70,005.46, and having received checks to the amount of $117,035.21, there resulted a balance of $47,029.75 against the Keystone Bank arising from the exchanges of that day. If the only function of the Clearing House Association had been to provide a time and place for making these exchanges, its connection with the business would have ceased at this point, and the situation of the Keystone Bank would have been simply that of debtor to each of the banks from which it had received checks to an amount greater than the amount of those which it had delivered to the same bank, and the amount of its indebtedness in each instance would have been the difference between the sum of the checks delivered by it and of the checks which it received. But the connection of the Clearing

House Association with the matter did not end here. Under the constitution of that association, the debtor banks were required to pay the whole amount of the balance against them, respectively, not to the several creditor banks, but to the manager of the clearing house, an agent of the association, and he, not the debtor banks, was to pay to the creditor banks the respective balances due them. Provision is also made (Const. art. 17) for securing these daily settlements by the requirement that "each bank, member of the Clearing House Association, shall deposit securities with the clearing house committee, as collateral for their daily settlements." In the case of the Keystone Bank, however, this last provision had been made inoperative by a special agreement, which permitted and required it, in lieu of the deposit of securities as collateral for its daily settlements, to leave the check packages which it received upon any day with the manager of the clearing house, to be held by him until the balance appearing against that bank upon the settlement of the same day should be paid. This agreement had been made several months prior to the 20th of March, 1891. It had been previously continuously acted upon, and the course prescribed by it was pursued on that day. The packages received by the clerk of the Keystone Bank were placed in the possession of the manager of the clearing house, to be retained by him until the balance of $47,029.75 against the Keystone Bank should be paid to him, and were then to be returned to that bank. Thus far, it must be conceded, everything was done in conformity with the terms of the fundamental instrument of the Clearing House Association, by which the Keystone Bank, as a member thereof, was bound, except as that instrument had been superseded by a subsequent separate agreement, to which the Keystone Bank was a party, and as to the particular matter to which that separate agreement related it was precisely complied with. All this had been done, too, in good faith, without knowledge of the impending insolvency of the Keystone Bank. Soon after its packages had been left with the manager of the clearing house, however, that bank was placed in the custody of an examiner, and of this the manager of the clearing house was immediately informed. He at once consulted the clearing house committee, and was instructed by it to call upon the banks which had delivered to the Keystone Bank the checks which the latter had left in his possession, to make them good. He acted upon this instruction, and, upon receiving the full amount thereof, he handed over the checks to the banks from which the Keystone Bank had received them. Thus he disposed of all the checks which had been put in his possession by the Keystone Bank, and received the sum of $117,035.21 as the proceeds of such disposition of them. He received their full value, and therefore no question is made upon that score. He had held them, unquestionably, as security for the payment, through the clearing house, of the balance due by the Keystone Bank as per the settlement of exchanges made on that day, and therefore to the liquidation of that balance from the fund which they produced the complainant has made no objection. But, after this had been done,

there still remained in the possession of the Clearing House Association a surplus of $70,005.46, and, upon an account of this last-mentioned sum being demanded, it is stated (the details appear in the evidence) that it was all applied to the payment of certain other indebtedness of the Keystone Bank to other banks, and in cancellation of a certain separate and distinct indebtedness to the Clearing House Association "on loan certificates previously issued to the said Keystone Bank." Now, if the Keystone Bank itself would not, because of its insolvency, have been permitted to make this use of this surplus, then certainly the Clearing House Association, with knowledge of the insolvency, could not lawfully so apply it. "Undoubtedly, any disposition by a national bank, being insolvent, or in contemplation of insolvency, of its choses in action, securities, or other assets, made to prevent their application to the payment of its circulating notes, or to prefer one creditor to another, is forbidden," (Scott v. Armstrong, 13 Sup. Ct. 148;) and nothing could be more plain than that the effect, and indeed the evident intent, of the disposition which was made of this sum of $70,005.46 was to prefer those among whom it was distributed. It is true that the assets of a bank existing at the time of its insolvency do not include all its property, without regard to any existing liens thereon or set-offs thereto, and that liens, equities, or rights arising by express agreement, or implied from the nature of the dealings between the parties, and not created in contemplation of insolvency, are not invalidated, (Scott v. Armstrong, supra;) but no such rights, set-offs, or liens, as to any part of the surplus of $70,005.46, have been shown to affect this case. Article 17 of the constitution of the Clearing House Association, which requires that "each bank * * * shall deposit securities, * * * as collateral for their daily settlements," does also provide that "the committee shall apply the deposit of any defaulting bank to the payment of the balance due by such bank at the clearing house, * * * and the surplus, if any, shall be held as collateral security for other indebtedness to members of this association." But the deposit of these checks with the manager of the clearing house was not made under that article. It was made under the special agreement which obliged the Keystone Bank to leave with the manager the checks it received from the other banks, but entitled it to receive them again immediately upon payment of its balance, as shown by the settlement of that day, without performance of any other condition. They had not been subjected to, or pledged for, any other claim whatever. It is impossible to doubt, upon the evidence, that if the Keystone Bank had not failed, and had, within the prescribed time, paid its daily balance, these checks would have been thereupon delivered to it without hesitation, or question of its right to receive them, or pretense of title to hold them for any further or additional object. The manager of the association testified as follows:

"They were left until the balance should be paid,—until the balance arising from that exchange should be paid. That agreement was applicable [only] to the Keystone Bank, and, for the debt in the morning, the check packages

were to be held until the balances were paid in the clearing house. They were left in a satchel, in the custody of myself, until the amount of the balance, $47,029.75, should be paid. Question. Was that done in pursuance of an agreement made by the Keystone Bank? Answer. It was. Q. I understand that these packages of checks, alleged and supposed to amount to $117,035.21, were left with you, to be handed over on payment of $47,029.75? A. That is correct. Q. Had it [the special agreement] been acted upon every day during these two months that the Keystone Bank was a debtor bank? A. It had."

Here we have positive proof of what the agreement was, that it had been uniformly acted upon, and that it would have been followed upon the 20th of March, 1891, but for the fact that the bank was closed upon that day. The following conclusions inevitably result: The disposition which was made of the surplus of $70,005.46 was not warranted by the agreement or by the practice and course of dealing of the parties. The checks from which that surplus was realized were deposited for a single special purpose, and, therefore, for no other object was there, or could there be, any right, set-off, equity, or lien attached to them; and the application of any part of their proceeds to the payment of any indebtedness of the Keystone Bank, other than the balance of $47,029.75, was violative of law, in that it was a disposition of assets of an insolvent bank, so as to work a preference, and with the manifest intention of producing that result.

The objection which has been urged, that the bill does not name the proper persons as parties defendant, may be briefly disposed of. It is alleged in the bill and admitted by the answer that the defendants named "form and constitute the clearing house committee of the Clearing House Association of the Banks of Philadelphia, and sue and are sued as such, and, under the articles of association adopted by and governing said association, are given and intrusted with the entire charge, care, management, and control of the clearing house affairs and transactions, and the custody and control of the funds and securities belonging to or deposited with it." This is, in itself, sufficient to support a suit against them as representative of the whole body, and therefore it is not necessary to consider whether the present bill might not be sustained under the familiar general rule of equity pleading that "where there are many persons defendants, belonging to a voluntary association, against whom the suit is brought, * * * it is sufficient that such a number of the proprietors are brought before the court as may fairly represent the interests of all, where those interests are of a common character and responsibility." Story, Eq. Pl. § 116 et seq. The further contention that "this suit should be against the parties who received the $70,005.46,—that is to say, against those to whom the Clearing House Association paid the money,—is, in my opinion, palpably unsound. That association was placed in possession of property of the Keystone Bank. They disposed of it. They received the proceeds, and they applied them. To the extent that this application was unlawful, they must answer for it. The receiver of the Keystone Bank demands that the Clearing House Association shall turn over assets of that

bank to him. They reply that they have disposed of them, and have used the money thereby obtained; and, having failed to show that they lawfully used it, he is clearly entitled to hold them responsible. He cannot be required to look to those to whom the Clearing House Association has, in violation of the statute, transferred assets of the insolvent bank.

A decree for the plaintiff, in accordance with this opinion, may be prepared and submitted.